**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CAUSE NO.  1:11CR00090-001** |
| | ) | |
| **SARA GOLDEN** | ) | |
| | ) | |
| **Defendant,** | ) | |

# DEFENDANT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

On October 22, 2008, Sara Golden was one of six (6) co-defendants named in a seven-count indictment (1:08CR00165) with a Forfeiture.  Count 1 of the indictment alleged *Conspiracy to Commit Wire Fraud*; and, Counts 2 thru 7 alleged *Wire Fraud*.  A Superseding Indictment was filed on February 19, 2009, amending only the dates of the conspiracy in Count 1.

Sara Golden was arrested for her offense on October 28, 2008.  She was released on her own recognizance, and on November 7, 2008 was placed on pretrial supervision.  She remained on formal pretrial supervision until November of 2012, at which time, due to four (4) years of full compliance, she was afforded "web-based" reporting status.

On May 17, 2011, a one count information (1:11CR00090-001) was filed against Ms. Golden, alleging that between November of 2005 and July of 2006 she committed *Conspiracy to Commit Wire Fraud,* a violation of 18 U.S.C. §371.  Also on May 17, 2011, Ms. Golden filed a Petition to Enter a Plea of Guilty to this charge.  If the Court accepts her plea agreement, the government agrees to dismiss the Superseding Indictment under 1:08CR00165.  It is further agreed that Ms. Golden's restitution amount will be $500,000.

1

Guideline stipulations of Ms. Golden's plea agreement with the government include: a three (3) level reduction for acceptance of responsibility; and, a four (4) level adjustment for being a minimal participant in the charged conspiracy.

Ms. Golden's plea agreement also includes a cooperation agreement with the government.  In the event that she fulfills all of her obligations to truthfully and completely disclose all information with respect to the activities of herself and others, the government agrees to file a statement of substantial assistance pursuant to U.S.S.G. §5K1.1 and will recommend an additional four (4) level reduction to her offense level.  Overall, the guideline stipulations of Ms. Golden's plea agreement, while including the government's anticipated §5K1.1 motion, will result in a final adjusted offense level of **9**, allowing for a sentence range of 4-10 months within Zone B of the sentencing table.

Ms. Golden is aware that United States vs. Booker, 125 Ct. 738. 756-71 (2005) effectively changed the use of the Federal Sentencing Guidelines from mandatory to advisory status and allows an unarticulated weight to 18 U.S.C. § 3553.  Significantly, and given due deference to the plea agreement, Ms. Golden understands that the Court will make an independent determination regarding the Federal Sentencing Guidelines and that the Court remains the final authority of the sentence to be imposed in this matter.  It is with this understanding that this *Defendant's Sentencing Memorandum* is offered to the Court.

On May 4, 2013, Ms. Golden will appear before this Court for the purpose of sentencing and will reiterate her desire to plead guilty and accept full responsibility for her actions.

## II.     OFFENSE CONDUCT

Sara Golden has reviewed the Presentence Investigation Report (PSI) prepared by the United States Probation Department.  She believes the report is accurate and fair in all regards, including the government's description of her offense conduct as described in paragraphs 11-14

of the PSI report.  The Stipulated Factual Basis filed with the Court on May 17, 2011, regarding Ms. Golden's specific offense conduct reads as follows:

> *"Sarah Golden worked for Dina Wein Reis ("Reis") in Reis's marketing business in New York, New York from around 2004 through around January 2007. Golden was taught her job duties by Reis and others that worked in Reis's marketing business.  In that position, Golden "cold called" executives at large consumer product companies to solicit their products for Reis's marketing business.  Golden represented that Reis's business utilized her unique marketing promotions to distribute consumer product companies' products through established distribution channels to a variety of outlets that were typically difficult for the manufacturers to reach on their own.*
>
> *On or about from November 2005 through July 2006, Reis, Golden, and other Reis employees, contacted a company located in Kansas City, Missouri and told the company through phone conversations, correspondence, email and personal meetings, that if it sold its products to Reis the products would then be distributed through a marketing venture called the "Goody Pak Program" in which its products would be distributed free of charge to schools to be used for school fundraisers, and in order to generate marketing information on the company's products.*
>
> *From the experience and insight Golden had gained as an employee of Reis's marketing business over the previous few years, Golden knew that this statement was a material misrepresentation to the corporation about how Reis actually intended to distribute the company's products."*

### III.    SARA GOLDEN'S STATEMENT TO THE COURT

Sara Golden is knowingly and voluntarily pleading guilty as charged in Cause *1:11CR00090-001*.  In her *Statement to the Court,* which has already been submitted to the United States Probation Department, Ms. Golden candidly describes her offense conduct as well as her genuine sense of shame and remorse:

> *"I am extremely ashamed and embarrassed for my involvement in this offense. This shame and embarrassment began long before my arrest on October 28, 2008 and is with me daily.  I have thought about my poor decisions virtually every second of every day and am saddened by my poor choices.  I have never previously been in any kind of legal trouble.  I was raised in a loving family where we were taught the importance of morals and ethics.  Yet, during the period that this occurred, I obviously lost the moral compass that my family had*

ingrained in me.  For this I am deeply sorry. I am sorry for any harm that my actions caused.
I am sorry for the shame and disgrace I have brought to those persons standing beside me,
most especially my family.  I am fortunate that despite the shame I have brought about, the
response to all of this by my family and friends has been to provide me with unconditional
love and support.  They worry about me and are scared with me.  They have been helpful
beyond imagination, but I do carry an additional and separate sense of shame for putting
them through this.

　　　I will try to describe how it was that I came to work for Dina Wein-Reis and why I
stayed in her employment as long as I did (3 years).  I have many regrets.  I wish I had done
many things differently, or just acted upon my instincts (the ones my parents gave me) sooner.
I go over these regrets daily, but I blame no one but myself.  In the end, I am just terribly
sorry.

　　　I graduated from Indiana University in 1994 with a degree in Public Financial
Management.  Later that year, in December, I moved to NYC.  I didn't have a job, but knew
that I wanted to be in New York City.  In January 1995, I interviewed for a position as a
marketing coordinator with Lifetime Marketing.  Lifetime Marketing was a company owned
by Dina Wein-Reis that, I was told, marketed consumer products to adult living facilities.  I
was not hired directly by Dina, but instead by one of her top employees at the time.  In fact, I
didn't meet Dina until after I was hired.  I was thrilled to have been offered a job so quickly
and even more excited that the position was in marketing, an area of deep interest to me.

　　　Lifetime Marketing was a crazy, frenetic environment.  It took me nearly 4-6
months to realize that the business-of-the-business was "diverting."  I knew almost nothing
about diverting which didn't really matter because my job there was marketing, although that
did eventually change.

　　　In early 1996, Dina discovered that certain employees of the company were
stealing from her. She fired them and gave me the added responsibilities of their jobs.
Suddenly, I was dealing with the wholesalers to whom Dina sold the products she acquired.
My marketing responsibilities became secondary to duties of warehousing, transportation
and orders. Also, my interactions with Dina increased dramatically. She would call me at all
hours of the night or on weekends to either berate me or to talk about business. My hours
were often 9:00 a.m. until 8:00 p.m. or later. There were no lunch or dinner breaks; meals
were brought in. The job required long hours and produced high stress. It was not long
before I found myself depressed and anxious. When my physical health also began to
deteriorate (extreme weight-loss and kidney stones), I decided I had to get out of there. I
began interviewing with other companies.

　　　In January 1997, I left Lifetime Marketing and began working as a sales analyst
for Remy Amerique (later called Remy-Cointreau USA).  It was not a marketing position, but
it was a job and it got me out of Lifetime Marketing and away from Dina.  I worked for Remy

4

for almost 6 years.  Eventually I was promoted to Field Marketing Manager.

In 2003, I accepted a better employment position with Rheingold Brewing Company.  I was hired as their marketing director to re-launch Rheingold Beer.  But, in true start up form, I did everything.  Although I was making better money, I was exhausted from again working 60-70 hour weeks.  It was about this time that Dina contacted me and offered me employment with her company, Alliance Holdings.  I remember like it was yesterday when she said to me "if you ever work past 6 PM it will be for an emergency."  Even more important to me was that she was offering me a salary far greater than anything I had previously earned.  She was very persuasive hit every raw cord and weakness I had.  In April of 2004, I agreed to work for her again; a mistake I will regret for the rest of my life.

I worked for Dina's company from late April 2004 through mid March of 2007.  I was taught my job duties by Dina and several other employees already working for her.  Part of the work involved making cold calls to executives at consumer product companies to solicit products for Dina's marketing business.  These executives were told that Dina's business utilized her unique marketing promotions to distribute a company's' products through established distribution channels to a variety of outlets typically difficult for the manufacturers to reach on their own.

I disliked the work almost immediately and remember wanting to quit as early as 2005.  Dina was even more demanding than I had remembered and I increasingly found my business duties distasteful and questionable ethically.  I again began to experience physical and mental health problems.  I began seeing a psychologist that I had previously used when I was going through divorce.  My therapy sessions became weekly and this time were focused on my insecurities relating to work and Dina, and also my lack of self confidence and energy to extricate myself from her employment.  I wanted to quit, but didn't have the energy to look elsewhere.  I also knew that I wouldn't find a job offering similar compensation.

Between November 2005 and July 2006, I along with Dina and several other employees of Dina's, contacted a company located in Kansas City, Missouri.  In a series of discussions, they were told that, if they sold their products to Dina, their products would then be distributed through a marketing venture called the "Goody Pak Program".  These "Goody Paks" would include the company's product and would be distributed free of charge to schools to be used for school fund-raisers. They were told that this type of marketing enhances a company's "Goodwill" while also generating marketing information regarding their consumer products.

From the experience and insight I had gained over the previous few years with Dina's marketing business, I knew that we were making material misrepresentations to this corporation about how Dina actually intended to distribute the company's products.  The majority of the product would be diverted and sold on the grey market.

In January of 2007, one Dina's business transactions resulted in a civil lawsuit.

5

*Although it was settled in approximately three weeks, I was so frightened by this event and Dina's behavior and requests, that I knew I had to just leave. The fact that I was leaving with no job opportunities didn't matter. I'd rediscovered my moral compass and it was pointing me in only one direction – to leave, which I did immediately.*

*I had left Dina's employment hoping I would never have to look back. I have since struggled financially, but I have rediscovered "peace of mind" and the self-confidence to follow my truer instincts. The criminal indictment was handed down in October of 2008, approximately one and a half years after I had left Alliance Holdings. I so regret that I had not followed my instincts to leave Alliance sooner, because those instincts had been there all along.*

*I recognize that others have been harmed. What I did has also been devastating to my family, both financially and emotionally. I am terribly sorry and ashamed. Certainly, I will never again be involved in similar business activities and in the future will always follow my better instincts and the hard lessons I have learned.*

*Respectfully,*

*Sara Ribbler-Golden"*

## IV.    ACCEPTANCE OF RESPONSIBILITY, COOPERATION AND ROLE IN OFFENSE

### A.  Acceptance of Responsibility and Cooperation with the Government

Ms. Golden has provided complete and full cooperation with the government in this matter. Her efforts in this regard have been considerable. Her timely plea saved the Court the expense and time of a trial; and, her early admissions of guilt along with her cooperation furthered the government's case against herself and co-defendants. Ms. Golden's early acceptance of responsibility and cooperation is recognized both in the plea agreement and in the government's willingness to file a statement of substantial assistance pursuant to U.S.S.G. §5K1.1. Independently, the U.S. Probation Department's Presentence Investigation Report also credits Ms. Golden for her acceptance of responsibility in this matter.

### B.    Role in the Offense

In Ms. Golden's plea agreement with the government, it is stipulated that her role in this offense was minor in relation to her co-defendants, in particular, Dina Wein Reis'. Both the

government and the U.S. Probation Department believe that Golden warrants the minimal

criminal participant reduction of four (4) levels consistent with U.S.S.G. §3B1.2(a).  In support

of this reduction, we would draw the Court's attention to the discerning analysis found in

paragraph 14 of the U.S. Probation Department's pre-sentence investigation report, which reads:

> "According to the government, the facts of this case are extremely unusual and
> require a fact-based determination of roles.  While the charging documents focus on one or
> two specific deals done by Ms. Reis and other defendants, it would be unjust not to consider
> the roles in the context of their overall relationship.  Ms. Reis ran her business for
> approximately 20 years and reaped virtually all of the extraordinary profits, in the tens of
> millions of dollars.  Over the years she employed many dozens of employees in roles
> similar to Ms. Golden's.  While some employees, including Ms. Golden, would get
> occasional bonuses for participating in a consummated deal, the bonuses were sporadic
> and, if paid at all, minimal compared to the profits Ms. Reis reaped.  Moreover, Ms. Reis
> was an extremely demanding and often tyrannical boss.  There was never any question that
> she was completely in charge of her operations.  She micro-managed even the most minute
> tasks of her employees, leaving them virtually no discretion.  There was an almost cult-like
> quality to her relationship with her employees such as Ms. Golden.  Thus, while Ms. Reis
> could not have defrauded Bon Ami without the knowing assistance from some of her
> employees, the role differentiation could hardly be more dramatic, and Ms. Golden was a
> minimal participant when compared with Ms. Reis' commanding leadership role in this
> matter."

## V.   ADDITIONAL FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM

Currently, even without any of the adjustments allowed under 18 U.S.C. § 3553(a), Ms.

Golden's Total Offense Level as calculated by the U.S. Probation Department is **13** with a

Criminal History Category of **I**.  These calculations place her in Zone C of the Sentencing Table

with a guideline range of **12-18** months imprisonment.  Consistent with the plea agreement, the

government's motion for a 4 level downward departure pursuant to U.S.S.G. §5K1.1 and 18

U.S.C. §3553(e), will result in a total offense level of **9**.  This places her in Zone B of the

Sentencing Table with a guideline range of **4-10** months imprisonment.  Following the court's

consideration of §3553(a) adjustments, an additional one (1) level reduction would place Ms. Golden in Zone A where she would be eligible for immediate probation in a range of **0-6** months.

Counsel offers that there are several §3553 factors justifying a sentence in the probationary range for Ms. Golden, including: her lesser role in the offense committed; her cooperation with the government; the fact that her portion of restitution will have been paid in full; and, her exemplary conduct while on release, which has included 4½ years of supervised release. Ms. Golden has been fully prepared for sentencing since first entering into her plea agreement with the government back in May of 2011. The delays in bring her case to sentencing conclusion were due to matters relating to Ms. Wein Reis case and restitution. Ms. Golden realizes that her pretrial supervision has been a privilege allowing her to remain in the community; however, pre-trial supervision is not without hardship and restrictions similar to probation. Ms. Golden's compliance to her pre-trial status has been exemplary for 4½ years.

An additional factor that the court might consider in its analysis of §3553 factors, is that it was Ms. Golden who voluntarily ended her offense conduct by quitting her employment with Dina Wein Reis, nearly 1½ years prior to the criminal indictment in this matter. She left Ms. Wein Reis' employment not due to convenience or for a more lucrative job offer. To the contrary, she left with no waiting employment. Her introspection, guilt, shame, and eventual action to leave, were self-generated and occurred prior to her ever being charged in this matter. Susan Cohen a New York psychologist who was Sara's therapist from 2004-2010, writes in her letter to the Court:

> *To Sara's credit, she did eventually leave Ms. Reis employment. When it happened, it was done solely to separate from Ms. Reis and her company. This was before any criminal allegation and was even absent an employment offer elsewhere. From a clinical standpoint, I believe Sara's inability to sooner disassociate from Ms. Reis and her company was her lack of self confidence when faced with Ms. Reis's overwhelming personality. While this does not excuse Sara's actions when with the company, perhaps it helps to place her in proper*

*perspective with other codefendants and certainly Ms. Reis. Ultimately, Sara is not criminally motivated and she possesses a sound moral base.*

Additionally in this regard, Craig Schwimmer, a co-worker at who quit Ms. Reis' employment at nearly the same time, writes in his letter:

*"Sara and I both resigned within days of the settlement of the Roche litigation.  This was over a year before any criminal charges.  I had savings and other ventures to fall back on. Sara didn't.  She quit without a waiting client, job, or even a prospect of a paycheck.  She finally decided that she could not take another day of the emotional and ethical toll required in working for Ms. Wein-Reis.  She left Ms. Wein-Reis and that entire industry with the hope of rebuilding herself.  The criminal charges and Sara's arrest occurred on October 28, 2008, over a year after leaving Ms. Wein-Reis' company.*

A review of Ms. Golden's social history reveals that she was raised in Bexley, Ohio, a suburb of Columbus.  Her father, Samuel Ribbler, is a retired CPA; her mother, Helen, is a master's prepared registered nurse who continues to work at Ohio State University Hospital. Sara is the oldest of the Ribbler's three (3) children.  Her brother Max is 35.  He has an MBA and is employed as a supply manager for Kaplan.  Sara's sister, Leslie, is age 35.  She works as a project manager for Lawyer's Edge.  No member of this family possesses a criminal history.  As the Court will read in the many letters attached to this memorandum, this is an unusually close and loving family that remains highly supportive of Sara.

Sara attended Bexley, Ohio, public schools.  She later attended Indiana University from 1990-1994.  Except for the blemish of her work at Alliance Holdings, Sara possesses an excellent work history.  By all accounts she is hard-working, self-motivated, with excellent business skills.  Sara currently resides in New York City where she is employed at Sugar Foods Corporation.  Regarding this employment, she states *"After many setbacks, I gained employment with Sugar Foods on July 23, 2012.  I was upfront about my legal issues during the interview process so my boss is aware of my legal issues. I am grateful to have been given a chance to*

*prove myself and believe I am doing well. I hope that this is the company I retire with, many,*

*many years from now."*

Overall, Ms. Golden has no educational or employment deficits, and no rehabilitative

needs requiring the typical programs and correctional measures utilized by the courts.  Instead,

she presents before this Court as a person who is genuinely remorseful and unlikely to ever again

commit a criminal offense.


## V.    CONCLUSION:

In the light of the favorable pre-sentencing report filed by the U.S. Probation Department,

as well as the many §3533(a)(1) factors identified and discussed in this memorandum, Defense

would argue that an appropriate sentence would be one that allows for immediate probation in

Zone A of the Sentencing Table, rather than a sentence requiring imprisonment, intermittent

confinement or location monitoring required if she remains in Zone B.

## VI.    LETTERS TO THE COURT

Attached to this memorandum, are seventeen (17) letters written to the Court on behalf of

Sara Golden.  Two of these letters are from therapists she has seen within the past 8 years, and

the balance is from persons who know her as a friend, family member or work associate.  It

should be noted that several of these letters were written in July of 2011 in anticipation of

sentencing that was continued until now, but remain equally relevant in the emphasis of Ms.

Golden's character.  As a whole, these supplementary documents provide perhaps the best

evidence of the abundant qualities she possesses making her an excellent candidate for a

suspended sentence to be served on probation.

**Letters**

1. Craig R. Schwimmer, Business Partner and Friend of 8 years
2. Susan Z. Cohen, PhD, Defendant's therapist from 2001-2003 and 2004-2010
3. Helen A. Ribbler, RN, Defendant's mother
4. Samuel Ribbler, CPA, Defendant's father
5. E. Jane Scott, Former Co-Worker at Remy-Cointreau, Friend of 14 years
6. Stefan Unger, Business Associate, Friend of 15 years
7. Maxwell Ribbler, Defendant's brother
8. Brandy Goldberg, Friends since Elementary School
9. Michelle Hatch, Friend of 10 years
10. Marimer Rivera, Sister-in-law
11. Leslie Ribbler, Defendant's sister
12. Laurie Baker, Life-long Family Friend
13. Mark Cieslinski, Friend of 8 Years
14. Peter Sass, MD, Psychiatrist
15. Michelle Zebaida, Friend and co-worker 12 years
16. Melissa Kraras, Business Associate and Friend
17. Julie Cribari, Friend since Freshman Year (1990)at Indiana University

Respectfully submitted,


*s/ Robert W. Hammerle*
Robert W. Hammerle
HAMMERLE LAW OFFICE
1455 N Pennsylvania Street
Indianapolis, Indiana 46202
email: rhammerle@hfmm.law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certified that a copy of the foregoing has been served on all counsel of record this ___ day of _____, 2013, by the Court's electronic filing service.


*s/ Robert W. Hammerle*
Robert W. Hammerle

*Craig R. Schwimmer*
*145 W. 96th Street*
*New York, NY 10025*

April 16th, 2013

The Honorable Jane Magnus-Stinson
U.S. District Court Judge
Southern District of Indiana
101 U.S. Courthouse
46 E. Ohio Street
Indianapolis, IN 46204

    **Re:** *Sara Golden*

Dear Judge Magnus-Stinson:

    My name is Craig Schwimmer and I am writing you in regards to Sara Golden, my girlfriend and former business partner. She is deeply ashamed of her offense and will soon come before you to accept responsibility and be sentenced for her actions. Hopefully, the information contained in this brief letter can assist you to better understanding Sara as a person, because despite her criminal offense she is an honorable person with good intentions.

    Let me briefly describe my background and how I came to meet Sara. I am an MBA graduate of New York University's Leonard N. Stern School of Business. Currently, I am the owner and operator of POM Ventures, a business that provides financial and strategic planning for early stage firms and investors. Prior to POM Ventures, I was a financial analyst at Manufacturers Hanover from 1981-1986 and Director of Finance at Ambase, Inc. I was the Vice President for Sterling Forest from 1990-1999. From 1999-2003, I was President of Axiom Advisory, Inc. and, from 2006-2007 was President of Dandrew LLC. From March 2005 until March 2006 I was also employed by Dina Wein-Reis. It was in this employment capacity that I first met Sara Golden.

    I began my employment with Ms.Wein Reis in 2005. My work dealt with her personal assets. I am an experienced businessman, so before accepting Ms. Wein Reis' employment offer, I conducted due diligence of her and her business. This included interviews with Ms. Reis's outside counsel and her CPA. I had no familiarity with the diversion industry or the "grey market", but it was my conclusion that the business was legal and I accepted her offer of employment.

    My employment with Ms. Wein-Reis lasted approximately one year and ended with my resignation (which coincided with Sara's) following conclusion of the Roche civil litigation. The overall working environment that Ms. Wein-Reis created was probably the most intense and emotionally trying of my professional career. I found her to be a driven business person, extremely demanding of success. She was also one of the most manipulative persons with whom I have ever worked. She relied heavily on deprecation and deceit to manage her staff. On several occasions she requested that I represent things that I did not believe to be true, which I

(i.)

refused. Her professionals (her attorney and CPA) repeatedly tried to convince me of the legality of these activities. All of this created a tremendous tension between me and Ms. Wein-Reis. Only my years of business experience provided me the confidence and acumen to slowly recognize that all was not right with Ms. Wein-Reis.

Sara and I became friends during the first few months of my employment there. She was unlike anyone else there. Sara is exactly as she appears. She makes friends easily and keeps them. Sara had already been with the company for about two years. I correctly sensed in her an ally, someone who like me was uncomfortable with what was occurring. I discussed with her my uneasiness with Ms Reis's business practices and management style. Initially, I saw Sara as someone almost paralyzed by fear of failure, fear of losing a job and unfortunately impressed by Ms. Reis. She had difficulty reconciling her business sense and experience from the minute-by-minute manipulations of Ms. Reis. But slowly she began to appreciate the potential risks of the business and find confidence in the instincts that had been gnawing at her. She even began to consider the possibility of leaving Ms. Reis's employment. Her interim step was learning to say "No" or to limit her participation in aspects of the business where she felt uncomfortable. This became most evident in the months leading up to the Roche civil litigation. Although Sara had begun to discuss leaving the company months before the Roche litigation, it was the Roche litigation that finally made leaving her number one priority. It was seeing that litigation that drove home to her how ashamed she was for her participation in this business and her association with Ms. Reis.

Sara and I both resigned within days of the settlement of the Roche litigation. This was almost a year before any criminal charges. I had savings and other ventures to fall back on. Sara didn't. She quit without a waiting client, job, or even a prospect of a paycheck. She finally decided that she could not take another day of the emotional and ethical toll required in working for Ms. Wein-Reis. She left Ms. Wein-Reis and that entire industry with the hope of rebuilding herself. The criminal charges and Sara's arrest occurred on October 28, 2008, over a year after leaving Ms. Wein-Reis' company. Sara understands that part of any rebuilding means first facing up to what occurred before she left and whatever her sentencing holds.

Since leaving Ms. Wein-Reis' company, Sara and I worked together in various capacities for several years. She was devastated by the arrest and the legal strain that seems relentless. The emotional burden of her arrest made it virtually impossible to be successful. But most effecting on Sara, has been her own sense of shame and regret. Her remorse is genuine. Until only recently due to lack of finances, she was seeing a psychologist on a weekly basis to help her with the depression and self loathing. How sad, because this is a good person with much talent and even more potential.

Sara remains a truly remarkable person during this trying time. I have watched her help numerous friends through their most trying emotional and medical traumas. She is a special person, and a true friend. She is currently dealing with the life-long consequences of her actions and unsure of her freedom. Faced with financial difficulties, she experienced tremendous guilt and humiliation as she attempted to return to the workplace. She has recently garnered the emotional strength to renter the workplace. Sara is a contributing member to society. She is facing these issues head-on, attempting to be a good person everyday to everyone she comes in contact with. She has a strong support system of friends, family and work associates, of which I am a part. I can assure you - we will stand by her during this time.

Your Honor, I hope that you will look closely at who Sara is as a person. She has a very good heart. She is not criminally minded. The scheme committed was not devised by Sara, it would have occurred whether she was involved or not. She knows she did wrong, she offers no

excuses. I can say with certainty that Sara will never again be involved in anything like this matter. I believe she is the ideal candidate for probation.

Thank you for your consideration of my thoughts and hopes. I am certain you will fashion a sentence that is in the best interests of all concerned.

Sincerely,

Craig Schwimmer

Susan Z. Cohen, Ph.D.
140 West 79th Street #1F
New York, New York 10024

April 6, 2011

Steven K. Brock
Brock Sentencing Evaluations
6144 Hillside Ave., Suite 008
Indianapolis, IN 46220

Dear Mr. Brock:

I am a New York State licensed psychologist with 29 years experience doing individual psychotherapy. My training and orientation are largely psychodynamic. When I deem it necessary or appropriate I also utilize behavioral techniques. Sara Ribbler-Golden was my patient from June 2001 through March 2003 and again from January 2004 through January 2010.

Throughout our work together I saw Sara's diagnosis as most accurately captured by DSM IV 309.28 (Adjustment Reaction with Mixed Emotional Features). She presented as a bright, composed and ambitious young woman who had grown up in a stable, middle class Midwestern family. She initiated psychotherapy because she was unhappy in her marriage of several years to her college boyfriend. Early on she recognized that she had married too young and did not know herself well enough before making this commitment. Still, she cared a great deal for her husband and did not want to hurt him. As we worked on ending her marriage she was also focused upon her career.

Sometime after her separation Ms. Ribbler-Golden was offered and accepted a position at a small startup company where she saw room for professional growth that was not apparently available at her prior position. She made the transition to an extremely demanding small business and worked there from January 2003 to March 2004. During her time working for the startup, we discussed Sara's frequent feelings of being overwhelmed and overworked and her concerns about carrying the weight of coworkers who did not share her commitment to the success of the company. It was during this time that Sara was contacted by Dina Reis, a prior employer, who promised her security and a balanced work life.

In therapy, we examined the advantages and disadvantages of this potential position. Before I knew Sara, she had worked for Ms. Reis and had found her to be unreasonably demanding, mercurial and manipulative. Sara recognized that these traits probably still existed, but believed she had gained enough confidence and maturity in the intervening years to better handle Ms. Reis's strong personality. After much consideration, Sara ultimately decided that the generous salary, potential career advancement and promise of a more balanced work/life environment would be worthwhile. She believed that this time she could better set limits with Ms. Reis and have a reasonable work life. Unfortunately, Sara's hopes did not come to fruition.

During the next three years that Sara worked for Dina Reis, we spent many, many sessions focused upon Sara's desire to quit her job. Sara struggled to maintain firm boundaries, resisting entreaties to become more involved in Dina's personal life. It was clear that her self-doubt confounded her ability to extricate herself. She feared that she would not be able to find another job.

To Sara's credit, she did eventually leave Ms. Reis employment. When it happened, it was done solely to separate from Ms. Reis and her company. This was before any criminal allegation and was even absent an employment offer elsewhere. From a clinical standpoint, I believe Sara's inability to sooner disassociate from Ms. Reis and her company was her lack of self confidence when faced with Ms. Reis's overwhelming personality. While this does not excuse Sara's actions when with the company, perhaps it helps to place her in proper perspective with other co-defendants and certainly Ms. Reis. Ultimately, Sara is not criminally motivated and she possesses a sound moral base.

The morning that Sara was arrested we were to have had an early morning session. When we finally spoke a few days later and when we met a few days after that she was extremely frightened and distraught. She was filled with self reproach and remained that way throughout the 15 months of our continued work.

Not knowing what her sentence would be has been agonizing for Sara and it is my hope that the court will very soon reach a decision. It is my professional opinion that she takes full responsibility for her actions; is remorseful and will never repeat her errors.

Despite a reduced fee, Sara's legal fees and diminished earning power made it impossible for us to continue her psychotherapy. We have had a few extended phone conversations during the past months and she seems to be coping despite the strain of the prolonged proceedings. Whenever feasible, I would encourage her to resume psychotherapy.

Very Truly Yours,

Susan Z. Cohen, Ph.D.

**Helen A. Ribbler, RN**
**219 N. Drexel Ave.**
**Bexley, OH 43209**

April 13, 2013

The Honorable Jane Magnus-Stinson
U.S. District Court Judge
Southern District of Indiana
101 U.S. Courthouse
46 E. Ohio Street
Indianapolis, IN 46204

Dear Judge Magnus-Stinson:

I am the mother of Sara Ribbler-Golden, who will stand before you for sentencing in the near future. I hope that if I can help you to know the kind and wonderful person that she is and how she has suffered and changed since working for Dina Wein-Reis, and being arrested for crimes she committed as Wein-Reis's employee, you will consider freeing Sara from further external punishment. I am not certain when her internal, self-punishment will stop.

I am 68 years old and work full-time at the Ohio State University Hospitals as a staff R.N. I did not work outside my home until my youngest child was in school. I did get an MSN during those years at home. I plan to work as long as I am able.

Sam, my husband of 41 years and father of our 3 children, worked for Borden, Inc. for 24 years, as a Division Controller. He was downsized in 1994. Sam had several shorter duration controller positions after Borden. He is now retired. Fortunately, Sam is a prodigious saver and the children's education fund started at the time of our marriage, so we were able to afford their undergraduate college.

Despite many miles separating us, our family is very close, loving and interconnected. Sara, age 38, and living in New York City, is the eldest. Leslie, age 36, lives in Phoenix, and Maxwell, age 33, and married to Marimer, lives in Fort Lauderdale. There are no grandchildren, yet.

Thanksgiving is our favorite holiday. We spend it together at our family home of 32 years, in Bexley, Ohio. Everyone has a special job to do and this varies little; however, Sara has become a very good baker and, now, does the pies. Last year, as a 40th anniversary gift, the children, with Sara as the researcher and point person (a role she frequently holds), hired a photographer to document the preparations and the attendees. It may, well, have been the last time that my mother, age 94, and my Uncle Manny, age 88, would be able to make the 6 hour trip from Olean, New York.

"Small but mighty", is how my friend described Sara at age 3, as she comforted and defended a child being bullied in car pool. That description applies to Sara throughout her life. The blend of goodness, sensitivity, responsibility, bravery, and competence that she embodies makes Sara the

person that friends and family turn to when they need help. I have always trusted Sara, implicitly, and have depended on her a lot, from holding her newborn sister (within the confines of an armchair), while I run to the bathroom, to making her my healthcare POA. She has accompanied a depressed and terrified grandmother to the hospital for admission. She is the person her siblings turn to when they have issues or problems they won't discuss with parents. She is the person who arranged and accompanied a friend to doctor visits and hospital admissions when there was a cancer scare and major surgery. She is the person who took in a friend who was being harassed by a neighbor. She is the person who volunteers at a soup- kitchen. She is the person who finished a marathon 2 weeks after being arrested, despite being emotionally and physically drained and terrified about her present and her future, because she had raised a lot of money in pledges for one of her favorite charities. She is the person who begged jail personnel not to call her parents for identification information, after her arrest on October 28, 2008, because she feared the affect of the shock.

Sara is a law abiding and ethical person, despite the crime that she committed. She is deeply repentant and exists under a cloud of remorse, guilt and shame. The segment of her life that occurred between April, 2004 and March, 2007 is an aberration and it does not define her, although she will pay for it, for the rest of her life, and lives with it every day.

Sara had spoken to me of wanting to quit her job with Ms. Wein-Reis before March, 2007, but I urged her to stay on until she had another job. This is advice that I will regret for the rest of my life. I can't even talk of this to Sara because of the pain it causes. She tells me she is a big girl and that she made her own decisions. I know this, but still I have my regret.

Sara initially told few people about her legal situation. I had to insist that she tell her siblings, a month after her arrest. She wanted to delay their pain and worry. She also worried that she had brought shame to them. She has not told her grandmother or uncle. It is only recently that she has reached out to others for any additional support. The response she has received has been overwhelmingly supportive during this most difficult period of her life.

Sara follows the parole rules, to the letter, and has been commended by her Pre-Trial Services Officer. I believe that she is an excellent candidate for probation and would continue to be compliant with the rules set by the court.

Thank you for reading these thoughts. I hope that this information can help you to know Sara, better, and make it possible for her sentence to avoid prison.

Sincerely,

Helen Ribbler

SAMUEL RIBBLER
219 N. Drexel Ave
Bexley, Ohio 43209

April 13, 2013

The Honorable Jane Magnus-Stinson, Judge
U.S. District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Dear Judge Magnus-Stinson:

I am Samuel Ribbler, father of Sara Ribbler-Golden, who, in the near future, will appear before you for sentencing in U.S. v. Dina Wein-Reis, et al. I am writing to convey my support and deep love for my daughter Sara and my hope that you will show compassion in her sentencing. Despite the circumstances which will bring her before you, I would like you to understand that Sara is truly a good, responsible and caring person. She has felt and expressed shame, tears and remorse for her participation in activities that were determined to be dishonest and unlawful.

I am a retired accountant, having spent the majority of my working years in positions of responsibility and integrity as a Controller in the consumer foods and glass manufacturing industries. I earned a BBA and MBA from fine New York City universities, worked in 'Big Eight' public accounting and served six years in the US Army Reserve. I worked hard to provide comfort for my family and, while I am proud of my career accomplishments, I take most pride in the three children my wife Helen and I raised, helped to educate and instilled with self-assurance, confidence and independence.

Sara was our first child, born in Chicago in one of the few hospitals in the U.S. that, at the time, permitted a father in the delivery room. I watched with joy and amazement at her birth and I was permitted by hospital staff to photograph her arrival. Now a common practice in the delivery room, for its time it was the singly most extraordinary event in my life. As years passed, Sara continued to amaze and provide joy, as we watched her grow into a superior student in middle and high school, a popular cheerleader, a homecoming princess and, later, an Indiana University graduate.

Sara is a sensitive, intelligent and emotional individual, who will forever be confronted with her error in judgment, ethical lapse, and now, judicial punishment. She has accepted fully the responsibility for her actions while working for Ms. Wein-Reis and is deeply ashamed and remorseful. She acknowledges her wrong-doing and is embarrassed that, despite her up-bringing, education and perceived sophistication, she like so many others was easily tempted and manipulated by Ms. Wein-Reis. Despite our love, support and continuing reassurance to

4

the contrary, Sara feels that her actions have brought dishonor to not only herself but to the rest of our family.

Thank you for taking the time to more fully consider the person being brought before you for sentencing. Sara's rehabilitation began voluntarily several years before her arrest, when she left Ms. Wein-Reis' employ. She has worked hard to put the Wein-Reis years in the past and build a fresh start, a new life, and a new career direction. I hope that you will see fit to grant Sara probation so that she may continue to move forward in her effort to restore honor and dignity in her life.

Sincerely,

Samuel Ribbler

E. Jane Scott
45 Sutton Place South, Apt. 12D
New York, NY 10022


March 13, 2011


The Honorable Jane Magnus-Stinson
U.S. District Court Judge
Southern District of Indiana
101 U.S. Courthouse
46 E. Ohio Street
Indianapolis, IN 46204


Honorable Jane Magnus-Stinson,


It is my understanding that the Court will be sentencing Miss Sara Ribbler-Golden in the upcoming weeks.

I have known Sara for over 14 years, first professionally with the Remy-Cointreau Group and now as one of my closest friends. I also continue to do business with Sara and her current company. Professionally, Sara has always been a valued work partner. I have gone to her with many different situations all of which she has always handled at the highest caliber of professionalism. I would trust her implicitly to manage and execute anything that was to cross her desk.

Our professional relationship evolved when Sara chose to leave the Remy-Cointreau Group to pursue an opportunity with another company. Both Sara and I would call each other regularly to brainstorm, discuss strategy, advertising, public relations and marketing tactics. Over time, those conversations have changed to much more of a personal nature. Our friendship continued to grow and we have become true friends and confidants. She is someone I can always count on for support, solid advice and kind words and gestures when I need them most. For instance, I was scheduled for emergency surgery in 2009 and my husband was out of the country on business. Sara came with me for the doctor consultations, to the hospital for the surgery and was with me when I woke up after the surgery. She didn't leave my side until she had taken me safely home and ensured someone else could resume the caregiver responsibility. She did all of this for me while her entire family was in, from out of town, for the funeral and burial of her Grandmother. I can honestly say I was not surprised by her generosity although it meant the world to me. Sara had already proven her character to me in previous actions. We had an experience just a few years earlier when a mutual friend had been diagnosed with an abdominal tumor. Sara acted as this friend's medical advocate, arranged Doctors appointments, surgical consults, transfers of medical documents and put tremendous effort into ensuring that our friend was never alone through any of the process. She organized shifts for all of this woman's friends to cover at the hospital, transportation for the friend's family to come during the hospital stay, and all of the follow-up that ensued post surgery. Simply put, that is the type of person Sara is. There certainly isn't anything

I have asked of her that she didn't come through for me on. I value her friendship, her expertise and would trust her with my child, my home, my pets, my heart, and any of my possessions or matters.

I know Sara is well aware of the charges before her and takes full responsibility for the people and organizations that may have been affected. For this she is deeply ashamed and if she were able to go back in time with the knowledge she now has, I am positive her decisions would have been very different. I have been by Sara's side through the legal process and it has been a difficult and painful time. I have seen her through sleepless nights, tears, fears, and continual self-deprecation. She carries her shame and remorse in her heart everyday. There's not a day that goes by that I don't hear it in her voice or see it in her eyes and demeanor. Sara will carry the permanency of a felony record with her for the rest of her life. It will influence all aspects of her world, professionally and personally, going forward. She is very aware of the ramifications of this and it shapes her actions every day.

Sara is a significant contributing member of society; she volunteers at a food bank, contributes to various charities, she is a great sibling and daughter, an active and supportive friend and a professional business person. In my humble opinion, she is not someone who society would benefit from incarcerating. She has never been involved in an illegal situation before and I highly doubt she ever will be again. The system stands to gain so much more if Sara were allowed to continue to function, contribute and give back to society via serving probation versus a prison sentence. From the instant Sara was arrested she has assisted the Government fully and willingly to both provide information and comply with their wishes to prosecute this case. Sara has proven exemplary in her compliance of her current probation, and there is absolutely no reason to believe this would change going forward.

I hope I have been able to convey to the Court Sara is well aware of her actions in this circumstance for which she is remorseful and takes full accountability. I can say with all confidence this one situation is completely uncharacteristic of the person she is, the friend and family member we all love and trust and the type of person I am proud to have as part of my life and my community.

I would like to thank you and the Court for your time and consideration regarding this matter.


Sincerely,

E. Jane Scott

# ROBIN & STEFAN UNGER

154 Hidden Ridge Drive
Syosset, NY 11791

April 7, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Dear Judge Magnus-Stinson;

My name is Stefan Unger and I live at 154 Hidden Ridge drive, Syosset, NY 11791 along with my wife Robin. I work in the wholesale consumer products industry and have been so engaged for nearly 35 years. I have enjoyed a close relationship with Sara Golden since the mid 1990's. We met thru business and had a typical sales / buyer type of relationship. Over time our relationship evolved into a friendship so much so that Sara would come to our home at times over the years to spend religious holidays with our family.

As I stated above, Sara and I met through business and the relationship evolved into a friendship even while we continued to do business together. I have only known Sara to be an honorable person, who was always hard working and loyal to a fault. She is giving and caring and dedicated to causes as evidenced by her running in the NYC Marathon raising money for charities that she believes in. When I lost my parents, Sara was there to be with my family during our time of need, providing comfort and support. Friends like Sara are the ones who you always cherish. Our relationship today is as strong as it ever has been and I just asked her if she would like to be with us for the upcoming Holidays or was she going to be with friends or family.

The way that I heard about Sara's offense was from Sara herself. She was devastated by what happened and reached out to a friend who could offer comfort and a shoulder to lean on. She told me what she did; and, what she should have done. It was clear to me that she was profoundly ashamed and embarrassed. What Sara did not do was paint herself as a victim of Ms. Wein Reis, although I believe she could have done this quite easily. But that is my personal belief, and I do not wish to digress from how Sara has remained focused on her own responsibility since our earliest discussions.

There is no question in my mind that if Sara could take back the actions which led to her charges, she would do so in a second, especially in light of the fact that she knows that she has to live with this burden for the rest of her life. Unfortunately there are no "do-overs." Sara is deeply embarrassed and ashamed of what transpired and is living with the consequences of it forever. Furthermore, she realizes that her life has been changed forever by her association with Ms



Wein-Reis, and she also knows that the consequences of her offense and her past association with Ms. Wein-Reis will haunt her forever.

There is a saying that *"the only two things that are certain in life are death and taxes"*. If I were to add a third, it would be that Sara Golden will never ever be a risk for future criminal behavior. The reason for this is that she's a genuinely good person who got caught up in a situation that clouded her judgment. I can assure you that Sara has learned from her mistake.

My hope is that Sara will be placed on probation and yes, I will be there along with my family to offer support every step of the way if needed. We communicate on a regular basis and have for many years. There's no reason for us not to continue our friendship. Sara has learned her lesson and she will be in total compliance with all of the directives of the court.

Judge Magnus-Stinson, I can only hope that my written words can convey adequately what I would say in person. Please realize that Sara made a mistake, and she is still paying the price emotionally and always will. However, sometimes compassion is needed to help with the healing process and I ask of you to exhibit compassion in your decision with Sara.

Respectfully yours,

Stefan Unger

Maxwell Ribbler
1309 NE 3rd St.
Fort Lauderdale, FL 33301
April 20, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Dear Honorable Jane Magnus-Stinson,

My name is Maxwell Ribbler and I am the younger brother of Sara Golden for whom I am
writing this letter of character reference to you today.  While I currently reside in Fort
Lauderdale, FL with my wife and work in an administrative function for a university, the most
influential woman in my life during my years as a young boy was my big sister Sara.

For as long as I can remember, Sara played a pivotal role as the eldest child.  It is likely that Sara
never entirely knew her sphere of influence over my sister and me, but her compassion towards
us and others around us directly improved our lives.  When I was young I recall playing games
with her that we still laugh about today- often over a long Thanksgiving meal; as I grew older, I
found that our common school teachers greeted me with warmth and affection simply because of
my shared lineage with Sara; and when she moved off to college she became a source of
inspiration and success that I was determined to live up to.  In short, Sara created a path of
expected behavior for my sister and I that we were proud to follow.

I recall the evening Sara gathered her emotions together enough to call me and tell me of her
arrest.   It was not uncommon for Sara to call in the evening as we typically speak once a week to
catch up on events in our lives.  However, this call was different, and Sara had a hollow tone that
alerted me to something severe.  Sara expressed the details of her arrest and the pending
investigation.  She was clearly shaken by the course of events and she knew that her participation
with Ms. Wein-Reis was deplorable.  Sara articulated genuinely shame and remorse for her
actions and she was tortured by her decisions.  I was not certain how to take the news of the arrest
only that Sara has never been a trouble-maker and I could not believe that her involvement, while
entirely uncharacteristic of her, had come to this end.

Over the course of several subsequent conversations, Sara often expressed a tremendous amount
of guilt for any unrest that her errant actions would have on the family.  She often spoke about the
impact on everyone else, which is not uncommon for her.  Sara has always led with her heart and
love for our family and this instance was no different.  To this day, I cannot entirely explain why
Sara acted in the way that she did in working with Ms. Wein-Reis.  I would speculate that
because Sara has always tried to lift the family on her shoulders, much like that of a family
matriarch, that she in some way found working with Ms. Wein-Reis the best way to satisfy that
desire.  While her intent may have been well placed, her approach clearly was not and she has
taken full responsibility for her actions because of it.

There is not a single doubt in my mind that Sara has learned from her mistakes and that she
presents no risk of becoming a repeat offender in the future.  I am confident of this because Sara

(7)

Honorable Jane Magnus-Stinson- Re: Sara Golden Character Reference
April 20, 2011
Page 2

does not possess the type of personality that is inclined to break the rules and look for the path of least resistance. While she might have temporarily lost her moral compass, she was not looking for ways to cut corners to get ahead in life, she just made poor decisions as part of her life's journey and she is wise enough to not repeat those again. Moreover, Sara has already demonstrated this greater judgment as she had left Ms. Wein-Reis' firm prior to the investigation as she had come to her own ethical conclusion that her involvement was inappropriate.

Given your favorable consideration to accept the plea agreement, I am certain that Sara will uphold her responsibilities under the terms of the probation as she truly is a changed woman. Additionally, Sara has unconditional support from friends and family who are willing and able to commit to any level of involvement to ensure the needs of the court are met with this ruling.

Thank you very much for your time in reviewing this letter and it is my hope that this has helped you to understand Sara's character better.

Sincerely,

Maxwell Ribbler

AMERICA'S

**1.877.237.2317**

americasfloorsource.com

April 20, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Dear Judge Magnus-Stinson,

My name is Brandy Goldberg and I am the Chief Systems & Security Officer at America's Floor Source in Columbus Ohio. I am writing to you today on behalf of Sara Golden, my oldest friend and closest confidant. Sara and I met in 1977 in Columbus where we both attended the same elementary school. It was there that we became friends, and we have continued that friendship our entire lives. That being said, I appreciate this opportunity to provide you with any information that may illustrate her true character as seen by a lifelong friend.

When Sara and I were growing up we were friends. We played games together, rode bikes and talked about boys. Over the years before college, I spent a significant amount of time with Sara and her family. They were very close and they were always accepting, supportive, and generous. While my family was estranged, it was Sara's family that gave me a home away-from-home and helped shape me into the person I am today. Sara's parents always put their kids first and those memories are the reason I still spend Thanksgiving with them almost every year.

It wasn't until we were in our mid twenties that my relationship with Sara started to mature into what it is now. While most of our mutual friends were getting married and having children, Sara and I were both career focused. She was the only person I knew that took her job and career as seriously as I did. I respected her and often called her for advice or encouragement when things got tough.

Sara had worked for Ms. Wein-Reis right out of college, but left after developing kidney stones due to the high stress level. She had a couple of great jobs after that, and she seemed happier. Interestingly, when Sara went back to work for Dina a second time, she did not tell me right away. I believe she may have been embarrassed to admit she was going back to work for Dina, and that the draw of the job and the money were too much to say "No" to. We started speaking less often. Sara became more and more distant and I had almost given up trying to keep the friendship going. It was bad, because we are so close. One time I saw her having lunch with her Mom in Columbus and she hadn't even told me she was going to be in town. That was not Sara and did not represent our relationship.

**Corporate Office**

3442 Millennium Ct.
Columbus, Ohio 43219

p  614/237.3181
f  614/237.3405

4648 Interstate Dr.
Cincinnati, Ohio 45246

p  513/889.2774
f  513/889.2506

2402 North Shadeland, Suite M
Indianapolis, Indiana 46219

p  317/356.3181
f  317/356.2820

AMERICA'S

1.877.237.2317

americasfloorsource.com

It was after Sara left Dina's company that the Sara of old seemed to return. We spoke and saw one another more often. We were close again. She was struggling financially, but she was happier, more grounded.

It was over a year after leaving Dina's business that Sara was arrested for this matter. She didn't tell me about it immediately. That doesn't surprise me, because she is so ashamed and embarrassed. Still, I had suspected something was not quite right. It is difficult to explain, but in a way she seemed softer and more vulnerable. It was on a visit to Columbus that she told me about the arrest and all that had happened. She was no longer the strong confident Sara I had always known, she seemed scared and insecure. It was obvious that she had regrets and it was time that she was honest about her mistakes.

Over the months since Sara told me about her arrest I have seen changes to her life and her priorities. Her focus has changed. Yes, she is still focused on work, but she is working to try to get her life back together. She is focused on getting back on her feet and stabilizing her life through work, family and friends. I do not believe there is any chance of Sara making this kind of mistake again. She has learned from this mistake, and I have never seen Sara make the same mistake twice. I know that she feels a deep disappointment in herself, and she will carry this with her for the rest of her life. I hope that one day she will forgive herself for the decisions she has made, but I know that day will not come soon.

Having the privilege of knowing Sara and her family almost my entire life, I know that she has all of the support she needs to move forward. My friendship with Sara has never been stronger and I see her as an incredible person who I will always love and respect. As a representative of a small business that operates in Ohio and Indiana I still choose to have a business relationship with her and will continue to have personal relationship with her for as long as I live.

Thank you for the opportunity to provide you with my perspective and for taking the time to read what I had to say.

Sincerely,

Brandy Goldberg
Chief Systems & Security Officer
America's Floor Source
(614)-989-2191

**Corporate Office**
3442 Millennium Ct.
Columbus, Ohio 43219

p 614/237.3181
f 614/237.3405

4648 Interstate Dr.
Cincinnati, Ohio 45246

p 513/889.2774
f 513/889.2506

2402 North Shadeland, Suite M
Indianapolis, Indiana 46219

p 317/356.3181
f 317/356.2820

April 15, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Dear Judge Magnus-Stinson:

My name is Michelle Hatch. I live in New York City, NY, where I have resided for nearly 15 years, having moved here from Maryland, to start my career upon college graduation. I am currently employed as the Vice President/Merchandise Manager of Dining and Décor for Macys.com. I have been employed by the Macy's corporation for nearly 8 years. I am writing to you to provide a letter of character reference for Ms. Sara Golden, based upon my relationship and experiences with her.

I have been friends with Ms. Golden for nearly 10 years, and consider her to be one of my dearest friends. I was introduced to her by a mutual friend. My friendship with Ms. Golden was taken to a new level of closeness, confidence, and deep caring a little over a year ago. At that time, I had a very unexpected and unfortunate situation befall me. My next door neighbor at the time had a verbally abusive and threatening confrontation against me in the middle of the night, unprovoked on my part. The next morning, I reported the incident to the police and my landlord. In the light of day, I felt very uncomfortable returning to, and sleeping in my apartment. Ms. Golden generously offered to let me stay in her apartment, rent-free for as long as I needed, to work through legal and financial issues with the police and lawyers. Ms. Golden made the offer without hesitation, and when I informed her that my stay could be as long as three months, she reiterated the offer. I stayed with her for two months, during which time, we spent many evenings sharing confidences, laughs, and cries. She generously went above and beyond the normal friendship expectations, and shared her home, her belongings, her privacy, and her trust, in a way that I can never hope to repay or thank her enough for.

Those two months really cemented the bond as friends for both of us. I moved to an apartment only 2 blocks away, which has in part enabled us to continue our close friendship and bond. Above and beyond Ms. Golden's kindness and generosity, another reason for the development of this extra strong bond is that it was during my first few days of staying with her, that Ms. Golden confided in me of her offense. I was in total shock of the events and circumstances, which had occurred nearly two years prior. I, and several of her other friends, was unaware of the offense, her arrest, or the subsequent series of events. We had recognized and commented on her emotional distance and what appeared to be something weighing very heavily on her, but Ms. Golden kept everything to herself. Ms. Golden was so ashamed of the situation, because it is so out of character from the woman that I, and our shared friends, know. I would never, in my wildest and worst imagination, ever have thought Ms. Golden would be accused of, let alone commit, the actions for which she was accused. She explained the

circumstances and situations which had gotten her to this place, with shame and remorse, but also with honesty, and taking ownership for her part.

I, and the few other friends that she has shared this with since, have all embraced her with our loving friendship and acceptance. We do this, not only because of her genuine remorse and acceptance for whatever her punishment may be, but also because of the loving, caring, fine and upstanding individual that she is. From the way she cares for and looks after her younger siblings and parents, to her volunteer work and financial donations for the causes that mean something to her, to the smile she brings to all those that encounter her, Ms. Golden is truly an asset and a blessing to the community.

All of Sara's friends and family rally around her in this difficult time. We support her 100% in her rehabilitation, and know that she will not reoffend, or in any way present a risk of future criminal behavior. We look forward to being there for Sara, when the final sentence is handed down, so that Ms. Golden can move on from her lapse of judgment, to the next contributions to society and her betterment that she will make.

I cannot speak highly enough of Ms. Golden, and it was a great pleasure to be asked to provide a character reference for one of the finest individuals that I am privileged to call my friend.

Sincerely,

Michelle Hatch

Marimer Rivera
1309 NE 3rd Street
Fort Lauderdale, FL 33301

April 2, 2013

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Honorable Jane Magnus-Stinson,

My name is Marimer Rivera and I reside in Fort Lauderdale, Florida. I'm a Senior Financial
Analyst and work for one of the Fortune 500 companies with headquarters in Florida. I have
known Sara Golden for 7 years and the purpose of this letter is to provide the Court
information about Sara based on my relationship with her.

I have been married to Sara's brother for five years. I have known Sara since my husband
and I were dating. My current relationship with Sara is strong and healthy. Although I live
in Florida, we are in constant communication via e-mail and phone, and I see her at least
twice a year when the family gets together.

Over the course of the last seven years, I have been able to spend quality time with Sara and
learn about the great qualities that she has. Sara is a strong and independent woman. She is
also a hard worker and charismatic person with a great sense of humor. However, what I
have always admired the most about Sara is the way she treats the ones closets to her, her
family. Sara is a great daughter and sibling. Her mother and father mean the world to her
and she makes sure that they are always well and happy. She is also a great role model for
her middle sister and her younger brother. As a recent addition to the family, it is really
amazing to feel the love that she gives to everyone.

Sara is also a great human being to people outside the family. She cares very much about her
friends and ensures that she is there for them when they need her. She also cares about
others and makes sure that she is able to volunteer and that she supports special causes in
any way she can. One example of this is the fact that Sara volunteers regularly in her
neighborhood's Soup Kitchen where she prepares food for people in need. I know
volunteering fills her with great satisfaction and happiness.

I learned about Sara's offense shortly after the arrest, when she was initially accused with
the charges. I could not believe what was happening to her, especially because that behavior
was not at par with the Sara that I know. As mentioned before, one of the most important
things for Sara is her family and I know that she will not do anything to make them worry or
bring unhappiness. In addition, Sara is most happy when she can enjoy simple things in life
such as being surrounded by her family and friends. She takes care of them in a loving and
unconditional way, never expecting something in return. Because of that, the accusations
that Sara was facing were really uncharacteristic of the behavior that I have seen in her over
the last seven years.

I know Sara is deeply ashamed and remorseful about her conduct. Especially because I
know she feels she let her family down and that is something almost unbearable to her.

Marimer Rivera
1309 NE 3rd Street
Fort Lauderdale, FL 33301

Sara truly regrets what happened and whishes she was never involved in that situation. However, even though Sara accepts full responsibility for her actions, I know that during the three years that she was employed by Ms Wein-Reis, her moral judgment was compromised. However, I know Sara well enough to say that what she did was not only uncharacteristic, but greatly influenced by the strong personality of Dina Wein-Reis.

As mentioned previously, the accusations that Sara faces are really uncharacteristic of her, as such; I know she will never exhibit any criminal behavior in the future. The 3 years that she was employed by Ms. Wein-Reis are an exception to her life of being a good citizen and human being. Sara even recognized that her affiliation with Ms. Wein-Reis would only cause problems in the future and that is why she left the company before the criminal investigation. Sara is trying to live a normal life, starting from zero and building a business that is operated with the highest ethical standards.

Although these are difficult times for Sara, she has a great support system that will help her as she is placed on probation. I love Sara and I'm proud of being able to call her family. It is my hope through this letter that Sara faces the minimum rehabilitation period as she already has been through a lot and I know she learned her lesson. She will never again do anything that could jeopardize her morals, ethics and liberty. If Sara is granted a probation sentence, I can assure you that she will abide by all rules and conditions imposed by the Court.

Lastly, Sara is a person that has impacted my life in a very positive way. I see her as a role model to follow and I admire her strength and the women she is. I see in her the sister that I never had and someone that I can rely on and trust unconditionally. If I'm blessed with children in the future, I will designate Sara as their legal guardian, in the event that my husband and I are no longer capable to take care of them. That shows how much I trust her and consider her my family. Honorable Jane Magnus-Stinson, I thank you for taking the time to read my letter and hopefully this give you an idea of Sara Golden's character as it pertain to the case.

Sincerely,

Marimer Rivera

**Leslie I. Ribbler**
**10301 N. 70th Street, #201**
**Scottsdale, Arizona 85253**


**May 10, 2011**


The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204


Dear Honorable Jane Magnus-Stinson,

My name is Leslie Ribbler.  My sister is Sara Ribbler-Golden.   I am writing you, respectfully, on behalf of my sister, who will be standing before you for sentencing in the near future. I am writing you today in the hopes that I can help you get a clear understanding of who she is, where she came from, and her character.  I hope that you will see that Sara is not only an amazing person in my life, but an amazing citizen and person in her community.

My parents raised Sara, my brother Max, and I in Columbus, Ohio.  We are an extremely close family and although Sara, Max and I could not live at further ends of the United States, we use every opportunity to go home to our parents' house in Ohio.  We all agree that their home is our "safe and happy place" where we can always go to regain our footing when reality and life become difficult.   Over the past couple of years, we have spent many long weekends in the "cocoon" of my parents' house learning to deal with the situation for which we are faced with Sara's legal trouble.

Days after Sara's arrest, my Mom called me devastated and needed to talk.  I learned of Sara's situation through my Mom's sobs.  Until that day, I had never seen or heard my Mom cry and I had only seen my Dad cry at Sara's wedding.  We did not know how we would handle the situation.  We only knew that our family was strong enough and had enough love for each other to get through it, no matter the outcome.  Only days after I first learned of Sara's arrest, Sara called me and told me herself.  Her biggest fear was that she had shamed and disappointed the family.  She was worried that we couldn't love her the same as we once did.

Sara has been my best friend and role model for my entire life.  She has always set an example to which I can only hope I live up.   She has taught me that goals are achieved by hard work and by not letting fear hold you back.  Sara has run and completed four New York City Marathons.  She volunteers regularly for eight hour shifts at a soup kitchen in Manhattan.  Sara is the first person to go to the aid of a friend or family member in need.  Weeks before her arrest, she arranged and hosted our entire extended family for my Grandmother's wake.  All while training for the Marathon and caring for her sick friend.   To me, these things are extremely

(11)

admirable but what I love the most about Sara is the hardest for me to put into words. Sara is my biggest advocate and support system. She has helped me though every tough time I have ever experienced. She has nursed my broken hearts with Chinese food and good conversation. She has written me countless letters of encouragement when I needed it but was too proud to admit it. She is absolutely beautiful on the inside and out. And, during this entire legal process, while remorseful, afraid, and ashamed, Sara's biggest fear has been causing pain and embarrassment to her family.

Sara is genuinely apologetic and is deeply ashamed of her conduct with regard to the offense. Sara takes full responsibility for her actions and will comply with any rules set by the court. I pray this letter helps you to know Sara a little better and I ask you, on behalf of myself and my family, to consider Sara's good character at sentencing by hopefully considering probation. Prior to her time working with Dina Wein-Reis, Sara had never been in any legal trouble and I know she will never be again. I know Sara is a good and ethical person and will use this experience for good. Please consider that at sentencing and find her to be a good candidate for probation. Sara has a very strong family and specifically a sister that will be by her side no matter the outcome.

Thank you for taking the time to read this letter.

Sincerely,

Leslie Ribbler

Laurie Baker
145 West 96th Street, Apt. 4C
New York, New York 10025

April 7, 2011

The Honorable Jane Magnus-Stinson
U.S. District Court Judge
Southern District of Indiana
101 U.S. Courthouse
46 E. Ohio Street
Indianapolis, IN 46204

Dear Judge Magnus-Stinson,

I am writing to attest to the character of Sara Ribbler-Golden whom I have known since before she was born. I am best friends with her mother, Helen, since 1960 when we met while attending The Mount Sinai Hospital School of Nursing in New York City where we graduated in 1963 as registered professional nurses.

The conduct which resulted in this offense is completely uncharacteristic of the person I know Sara to be in the past and present.

Sara resided with me for several months in early 1995 when she came to New York to get her first job after graduating from college. Soon afterward, Sara obtained an apartment across the hall from me, where we both continue to reside. (In fact my apartment is the same apartment her mother had when she married Sara's father in 1970 and moved to Chicago)

Since Sara came to New York City, I have come to know her and her values as a responsible, kind, caring, ethical adult and we have developed our own friendship, apart from the friendship I continue to maintain with her parents. I know first hand how ashamed and genuinely remorseful Sara is about the conduct which contributed to this serious offence. It has truly altered her life.

Sara volunteers in a food pantry which supports our upper west side community. She even ran the New York City Marathon on behalf of this cause. Every year we vote together (being in the same election district). We have regular Sunday dinners together where we have lively discussions about current events, political, social, and artistic topics. I know first hand Sara's values, ideas and energy have much to contribute to society and I respectfully hope that you will take this into consideration at sentencing.

Sincerely,

Laurie Baker RN

Laurie Baker, RN

May 15,2011

The Honorable Jane Magnus Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm.307
Indianapolis, IN 46204

Dear Honorable Jane Magnus Stinson:

My name is Mark Cieslinski. I currently live in Buffalo, New York. I am SVP Sales for Help Remedies, Inc.
I have known Sara Golden for approximately 6 years. I am writing to provide the court information
about Sara.

I am a personal friend of Sara. It began while she was working for Ms. Wein-Reis. I am still friends with
her today. Since I have known Sara, she has been a very kind and caring person. She always took the
time to listen to me and provide input into business and personal issues.

I actually heard about the offense from Sara. I had lost touch of Sara for a few years due to personal
happenings in my life. In September 2010, I decided to reach out to reconnect with Sara and during our
conversation she told me about the offense. I was surprised when I hear the charges against her. It
surprised me because I thought she would have left Ms. Wein-Reis years before. This is due to our
conversations years ago about her tense relationship with Ms. Wein-Reis and her desire to do
something different. I believe she was questioning her business practices and was searching for a new
start. We both talked about her getting back into a promotions/marketing role like her prior work
history. Looking back, I believe that a major factor in her continuing with Ms. Wein-Reis was financial.
She was caught up in a venture/relationship that was difficult for her to walk away from.

I believe that this experience has created genuine remorse for Sara. I believe that she is very ashamed
of her conduct. I believe if I didn't reach out to her in September 2010, she would have not reached out
to me. This was due to the embarrassment of having to tell the story once again to another individual.

Sara has learned a hard lesson. I do not believe that she will ever proceed down this path again in any
future endeavors. I believe even at the end of her tenure with Ms. Wein-Reis she was questioning the
business and was at her limit.

I believe if she is placed on probation, she will not stray again. She has talked many times about how
focused her family and friends are in providing a support system for her. I will also be a member of that
support system that inquires and provides guidance into her new ventures.

I believe that this was a life changing/hard lesson for Sara to experience. She has positively grown from
the experience and has been taught many valuable lessons about ethics and character. She will take
these lessons and make herself a better person.

I am hopeful that you will recognize she is prepared to take responsibility for her actions and move
forward in a positive manner.

Regards,

Peter Sass, M.D.
150 East 94th Street
New York, NY 10128
Telephone: 212-396-1722
Facsimile: 212-396-2777

Steven K. Brock
Brock Sentencing Evaluations
6144 Hillside Ave., Suite 008
Indianapolis, IN 46220

May 11, 2011

Dear Mr. Brock:

I am writing this letter to you at the request of Ms. Sara Ribbler, regarding her plea
agreement with the United States Government. I am aware that she is entering a guilty
plea for one count of Conspiracy to Commit Wire Fraud.

I am a licensed physician in good standing in New York State. My specialty and practice
is in the field of Psychiatry. I hold a current Board Certification in the medical specialty
of Psychiatry and was previously Board Certified in the sub-specialty of Forensic
Psychiatry from 1998 – 2008. I plan to renew that certification in the near future by
sitting for the renewal examination given by the American Board of Psychiatry and
Neurology. I am also a practicing psychoanalyst as of 2006 upon my graduation from the
NYU Psychoanalytic Institute, which is accredited by the American Psychoanalytic
Association. My current practice consists of direct patient treatment across the spectrum
of psychiatric diagnoses and problems. I am concentrated in the areas of psychotherapy,
psychoanalysis and psychopharmacologic treatment. I have maintained a private practice
since 1996 when I graduated from my residency training program in psychiatry at New
York University/Bellevue Hospital Center. I hold a teaching appointment at New York
University as a Clinical Instructor in Psychiatry.

Ms. Ribbler has been a patient under my care since November 17, 2008. She presented to
me with depressive symptoms and significant anxiety which I believed were connected
with her recent arrest on October 28, 2008. Since her treatment under my care began, I
have seen Ms. Ribbler in my office for psychiatric medication management and
supportive psychotherapy. Her treatment frequency has ranged roughly from monthly to
bimonthly to date. Ms. Ribbler has been a compliant patient who currently is prescribed
Lexapro, an antidepressant medication, and Klonopin, an anti-anxiety medication. Since I
initially met with Ms. Ribbler in consultation, she has experienced a marked
improvement.

In my opinion, Ms. Ribbler's arrest and the criminal action against her to date have been
significant enduring stressors for her, causing the anxiety and depression for which she
has sought help from me to date. A criminal prosecution is a known cause of psychiatric

Peter Sass, M.D.
150 east 94th Street
New York, NY 10128

symptomatology for most anyone against whom serious charges are brought by the
Government. I believe that Ms. Ribbler has suffered to an even greater degree than would
typically be expected because her background has entailed no prior criminal history, a
solid career with a good reputation, and her coming from an upstanding family located in
Ohio. Ms. Ribbler had enjoyed a career history of success through honest business
dealings. As her arrest and the pending charges of Fraud are completely uncharacteristic
for Ms. Ribbler, her anxiety and depression from day to day have been rather intense but
with gradual improvement as a result of the pending closure of her case. From an
emotional point of view, Ms. Ribbler has suffered a great deal to date since her arrest, as
every aspect of her life has radically changed. Most significantly, Ms. Ribbler has carried
a great deal of shame, embarrassment, and humiliation as a result of her involvement with
a particular employer, who, upon information and belief, is likely going to serve jail time
for orchestrating the fraudulent activity. In essence, Ms. Ribbler has lived with the sense
that a dark cloud looms over her head. Therefore, the settlement and resolution of this
criminal matter is very likely going to lead to the dissipation of her residual anxiety and
depression from which she currently suffers.

It has been consistently obvious to me that Ms. Ribbler is extremely regretful and
remorseful for any involvement she may have had with an employer allegedly involved
with illegal business activity. In my opinion, whatever wrongful involvement there might
have been on Ms. Ribbler's part with her employer is not consistent with her good
character, which has been devoid of any immoral, antisocial or sociopathic traits. In fact,
Ms. Ribbler has enjoyed a lifelong history of honesty, close family ties, and cohesive
relationships with many friends and colleagues, which are not traits typical of criminals
and individuals with moral defects.

From my conversations with Ms. Ribbler, I have come to believe that she was under the
strong emotional influence of an employer who she unfortunately allowed to hold power
and control over her emotions and conduct. In my opinion, whatever involvement with
which Ms. Ribbler had with her employer that led to her arrest and the subsequent
criminal prosecution is the result of this type of influence which temporarily suspended
her pre-existing good judgment. Ms. Ribbler having apparent insight into this cause is an
outstanding sign and is representative of an excellent prognosis for Ms. Ribbler having no
future negative involvement with the law. Ms. Ribbler to date has paid a very heavy price
subsequent to her arrest, one that she will never forget. Without incarceration or a
conviction being on her record, I am confident that Ms. Ribbler's anxiety-ridden
experience post her arrest and her regret and remorse over the relationship with her
employer will forever deter her from engaging in any future activity that is not strictly
legal, honest and moral. Therefore, in my medical opinion, justice has already been
served in this matter.

2

Peter Sass, M.D.
150 east 94th Street
New York, NY 10128

I realized that I have no standing with any prosecutorial agency or in any Court of Law to
make recommendations regarding Ms. Ribbler's pending criminal matter. At the same
time, I certainly hope that justice is tempered with compassion and mercy for Ms. Ribbler
to now be able to resume her life which has been replete with honest work, moral conduct
and healthy relationships.

Sincerely,

Peter Sass, M.D.

3

Michelle Zebaida
7 East 14th Street, Apt. 18K
New York, New York 10003

April 18, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 east Ohio Street, Room 307
Indianapolis, IN 46204

Dear Judge Magnus-Stinson:

My name is Michelle Zebaida; I am 38 years and have lived in Manhattan for the last 13 years. I work
in the fashion industry and have been at my current company for 9 years now.
I have known Sara Ribbler-Golden for about 10 years now. I remember the night I met her for the first
time. We both attended a mutual friend's engagement party. My childhood friend, Amy, was marrying a
friend of Sara's husband (now ex-husband). I just thought they were the best and nicest couple when I
met them that night. I just knew I had to be friends with this beautiful, Midwestern girl. She was cool,
hip, fun, friendly, warm and made you feel comfortable to be around.

Today I am here to write about my closest friend Sara Golden. She has been such an inspiration in my
life and has helped me in so many ways for which I am eternally grateful. She has always been there
for me as a friend and is someone who helps to guide me in life. In fact, the reason I am working for
my current company is because Sara helped me to prepare my resume, get ready for the interview and
gave me the courage to go after this position. Sara has given me such hope and insight in the most
meaningful ways on how to live, love and endure. This all comes from her family, who are the most
amazing and most loving human beings I have ever met (outside of my own family). With Sara's
family there is never a judgment and they are always accepting.

Sara is an extremely intelligent and hard working person; this is something that I have always admired
about Sara. I look up to her every day and her accomplishments through the good and the bad. I only
wish I could be that smart, strong and dedicated in the way she lives her life. It's incredible and such an
honor to be her friend and have her in my life. I know she will always be there for me even though we
all live our lives and move on to new chapters as we get older. She is sincere and true to her word
always!

Your Honor, Sara was so ashamed to tell me and many others of the charges she was dealing with
because she thought we would judge her and not be her friend. When she told me about it 6 months
later, I was so heartbroken and shocked at the charges she was facing and could not imagine anyone
ever saying anything bad or incriminating about Sara. Sara's behavior that led to the charges against
her is completely out of character for the person she is. Sara is completely accepting of her mistakes
and lapse in judgment while working for Ms. Wein-Reis. She is ashamed and remorseful and I am
certain she will never make the same mistake again. Sara is the most loyal, honest, loving and
inspiring woman I know and love.

I wish there were more Sara's in the world, there are so many selfish, materialistic and superficial

15

people we encounter in life and I am so grateful for meeting this precious, classy lady 10 years ago at a party and becoming her friend. It's like winning the lottery in my opinion.

Lastly, I would like to address the beauty of the friendships and family life that Sara has, they are the most supportive and warm-hearted, they come from and teach such incredible values and morals that anyone should wish they could embrace, always!

Your Honor, Sara is the most amazing human being I have known.  I love, respect and admire her and, she is not in any way a hazard to anyone and only does well for people. She has always been such a support and loving friend, part of the family. I am honored to call Sara my best friend for life.

Thank you very much for taking the time and courtesy of reading my letter. If there is anything you may need from me on behalf of Sara Golden, I am here 24/7 for you and her.

Thank you,


Michelle Zebaida
516-532-0849-cell
Michmo9h8@yahoo.com

Melissa Kraras
237 Towyn Court
Lower Gwynedd, PA 19002

April 13, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

### RE: Sara Golden

Dear Judge Magnus-Stinson:

I am writing in support of Sara Golden with the desire to share with the Court both my knowledge of and experience with Sara as an individual, and with the hope that this will aid in the Court's decision making process with respect to her sentencing.

I am a graduate of Harvard Law School and I practiced law for several years as a commercial litigator. Having always been interested in international transactions and foreign cultures, I left the practice of law in the mid 1990s and got involved in the international distribution business. I immersed myself in what can only be described as an infinitely complicated, exciting and challenging business climate, and ultimately started my own company specialized in launching and distributing consumer goods (including medical, beauty and food products) in "high risk" markets outside of the United States.

I met Sara in 2004 in the context of an initial meeting with Ms. Wein-Reis. Ms. Wein-Reis had contacted me stating that she was interested in formulating her own international distribution business, and suggesting that I could work with her company to broaden my portfolio of products. I ultimately declined her offer to either work together or to merge our businesses, but I remained in contact with Sara even after she left the employ of Ms. Wein-Reis. Over the years that I have known Sara, I have seen her to be an extremely enthusiastic, loyal and very hard working individual; and perhaps more significantly, Sara exhibited great integrity in our business relationship, notwithstanding her compromising workplace environment.

I learned of Sara's offense through a close mutual friend, and I was greatly saddened and surprised by the news. It is apparent to me that Sara was and remains to this day deeply ashamed and embarrassed by the actions which led to her charges, and unfortunately, she will have to live

16

with the consequences of those actions for the rest of her life.  Sara does not say that she has been wrongly charged nor does she seek to place blame on others for her own actions, although it would certainly be easy and plausible for her to do so.

From my own business experience as both a lawyer and entreprenaur, and particularly in the context of high stakes transactions, I have seen how lapses of good judgement in the heat of the moment, even if only brief, can lead to the downfall of otherwise honorable individuals. However, I believe that it is the reaction of the individual after the lapse that separates the honorable from the dishonorable, and the honest from the dishonest amongst us.

To my knowledge, Sara's actions and life until the time of her employ by Ms. Wein Reis, and certainly thereafter, have distinguished her from those who cannot recognize their own fault, and the harm to others that they have caused.  I have no doubt that if Sara could retract the actions that led to her charges, she most certainly would, because I remember very well the great relief she expressed when she left the employ of Ms. Wein Reis, and her desire to start anew on projects that were both personally and professionally fulfilling.  Since the time of her charges, I have also seen Sara work very hard to re-build her life where another, weaker individual might simply withdraw into a state of self pity.

Unfortunately, Sara's faulty actions cannot be reversed, nor can her mis-steps be retraced. However, I do not believe that under any circumstances Sara would ever repeat this behavior in the future, because Sara is fundamentally a good person who has taken responsibility for her actions and misdeeds.

I hope that my words provide some insight into who Sara is as an individual, and I sincerely hope that this Court will extend the greatest compassion possible, and the utmost in leniency with respect to Sara's sentencing.

Respectfully yours,

Melissa Kraras

April 17, 2011

The Honorable Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana
46 East Ohio Street, Rm. 307
Indianapolis, IN 46204

Re: Sara Golden

Dear Honorable Jane Magnus-Stinson,

My name is Julie Cribari. I live in San Diego, California with my husband and our two year old son. I am the Operations Director of a private medical practice where I have worked since we relocated to San Diego from the Midwest four years ago. I am writing to you today to provide you with some additional insight regarding Sara Golden.

Sara and I met in 1990 in our freshman dormitory at Indiana University in Bloomington, Indiana. We began an amazing friendship shortly thereafter and to this day, over twenty years later, are the best of friends. During our time at IU we were together nearly every day and also traveled to Seville, Spain together for our semester abroad during our junior year. Since college, although we have lived in different cities, we have visited each other frequently, vacationed together and had marathon phone conversations. Our geographic distance has never affected the closeness of our friendship. Sara is my confidant and truest advisor. She is loving, honest, frank and loyal. Our continued friendship is a great source of pride for me.

Sara's arrest took place a couple of weeks after I gave birth to my son. It was not until she came to visit me months later that she informed me of it. During our visit she told me that she had not wanted to burden me after the birth of my child. I will always regret that I was not there for her at that time but her concern for me is typical of her friendship and generosity. Looking back on what seems so inconsequential in comparison, Sara listened to all of my stories of new motherhood with such thoughtfulness before sharing the events she was facing. Upon hearing the details of the offense I was stunned. Sara's actions were completely uncharacteristic of the person I have known for the last two decades. She is mortified and embarrassed. I know this incident is completely out of the ordinary and had to be a result of her working with Ms. Wein-Reis for that period of time. Sara assured me that she was accepting responsibility for her actions and I could see and feel her remorse. I have felt it in every conversation that we have had since.

I assure you that she has a wonderful group of family and friends to support her during this time, and always. I know her family well and they have always treated me as one of their own. They will stand by her, as will I, during whatever is to result from her actions. I ask you on Sara's behalf for leniency. I hope that I have helped you to better understand her true character. I appreciate you taking the time to read my thoughts and hope they shed more light on your pending decision.

Thank you very much,

Julie Cribari

Respectfully submitted,


*s/ Robert W. Hammerle*

Robert W. Hammerle
HAMMERLE LAW OFFICE
1455 N Pennsylvania Street
Indianapolis, Indiana 46202
email: rhammerle@hfmm.law.com

## CERTIFICATE OF SERVICE

The undersigned hereby certified that a copy of the foregoing has been served on all counsel of record this ___ day of _____, 2013, by the Court's electronic filing service.


*s/ Robert W. Hammerle*

Robert W. Hammerle